DISTRICT OF COLUMBIA, Appellant,

v.

Bertha HOWARD, Appellee.

No. 89-256.

District of Columbia Court of Appeals.

Argued Jan. 22, 1991.
Decided March 28, 1991.

---

Donna M. Murasky, Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, Washington, D.C., for appellant.

Edward S. Horowitz, Greenbelt, Md., with whom John B. Low, Temple Hills, Md. and Stephen C. Offutt, were on the brief, Greenbelt, Md., for appellee.

Before ROGERS, Chief Judge, and FERREN and BELSON, Associate Judges.

ROGERS, Chief Judge:

The District of Columbia appeals from a judgment in favor of appellee, Bertha Howard, as the result of the alleged wrongful death of her husband following his fall down a flight of stairs. The District assigns numerous errors, including the failure of appellee to establish that the emergency medical technicians or the transporting police officers breached any standard of care in their treatment of Mr. Howard, that there was insufficient evidence the police officers assaulted and battered Mr. Howard when they put him in or took him out of the paddy wagon, and that appellee failed to establish that any omission or conduct by District employees proximately caused Mr. Howard's paralysis and death. Alternatively, the District contends that it is entitled to a new trial on the grounds that the verdict was against the weight of the evidence and rested on expert opinion based on factual assumptions unsupported by the evidence and beyond the scope of the expertise of the expert witnesses and on speculation. Finally, the District maintains that it is entitled to a new trial because the testimony of the treating physician not listed as an expert witness pursuant to Super.Ct.Civ.R. 26(b)(4) was impermissibly restricted so that he was not permitted to testify about the connection between the initial injury and the subsequent paralysis and death.[1] We agree that there was insufficient evidence of assault and battery by the police and that the restriction of the treating physician's testimony so prejudiced the District that it is entitled to a new trial.

I

On April 30, 1983, Larry Howard visited Cecilia Crawford at her apartment. While there he consumed a few beers and possibly a half-pint of whiskey. After approximately an hour, Ms. Crawford asked him to leave. Moments after he left, she heard "a little boom, boom sound." Looking out her door, she discovered Mr. Howard lying face down on a cement patio at the bottom of a flight of stairs leading to her apartment. She helped him up, placed a pillow under his head, told him to sleep it off, and returned to her apartment. Several hours later when Ms. Crawford's daughter, Denice, returned home, Mr. Howard was lying in the middle of the stairs, as if he had been trying to move up the stairs. She told him to leave, but upon still finding him there minutes later, tugged on his arm and told him to leave. Mr. Howard told her that he "couldn't move" or didn't want to move because of pain in his arm and neck, as well as numbness in his neck.[2] The Crawfords called for an ambulance, and emergency medical technicians Ronald Gill and Violet Maddox responded within fifteen minutes.

To the emergency medical technicians (EMTs), Mr. Howard appeared intoxicated and his breath smelled of alcohol. EMT Gill agreed with Ms. Crawford that Mr. Howard was still able to move his arms. All parties agreed that Mr. Howard was coherent and answered questions appropriately. They disagree about what information was conveyed to the emergency medical technicians by Mr. Howard and the Crawfords.

The emergency medical technicians claimed that they asked Mr. Howard questions about the cause of his injury but received no answers that would have suggested that he had fallen or that a spinal injury was possible. EMT Gill testified that he did not learn of Mr. Howard's fall until after Mr. Howard had been removed from the scene by the police. He admitted, however, that people at the scene had indicated that they had heard a noise in the

1. The District sought, as a last alternative, a remittitur. It has abandoned its claim of error regarding the amount of damages for lost services as a result of an errata sheet filed by the court reporter.

2. We view the evidence, as we must, in the light most favorable to appellee. *Jackson v. Condor Management Group, Inc.*, 587 A.2d 222, at 224 (D.C.1991) ("In considering a motion for directed verdict, the court must view the evidence in the light most favorable to the party against whom the verdict is sought"); *Payne v. Soft Sheen Prods.*, 486 A.2d 712, 718–19 (D.C.1985) ("The plaintiff must be afforded every rational inference from the evidence presented").

hall. Denice Crawford testified that she informed the emergency medical technicians that Mr. Howard had complained of pain and numbness in the neck and arms, and her mother testified that she informed them that Mr. Howard had fallen down the stairs. The only tests that EMT Gill remembered performing, however, were a blood pressure check and a reaction test that involved shining a flashlight into Mr. Howard's eyes. He admitted that his training regarding examinations of conscious accident victims required him to ask questions to determine the cause of injury, the location of any pain, and whether the patient could move his or her extremities.

Although the emergency medical technicians detected no injury as a result of their tests, they nevertheless urged Mr. Howard over a period of twenty to forty minutes to go to the hospital. During this time, Officer Beverly Miller, a master patrol officer with the District of Columbia Police Department, arrived on the scene in response to a call for ammonia capsules. Finding that the capsules were not needed, she stayed and joined in efforts to persuade Mr. Howard to go to the hospital. Mr. Howard, however, continued to refuse to be transported to a hospital. Because the Crawfords insisted that he be removed from the stairs, Officer Miller called a paddy wagon to transport Mr. Howard to the District's Detox Center, and Metropolitan Police Officers Kaminsky and Young responded.

Officer Kaminsky testified that the emergency medical technicians advised him that Mr. Howard was intoxicated, but otherwise all right. Mr. Howard refused to be driven home by the police. The police therefore decided to transport him to the Detox Center. Officer Kaminsky testified that when they attempted to lift Mr. Howard he was "dead weight," and because carrying him upright was too difficult, they carried him by his arms and his belt. They placed him face down on the floor of the paddy wagon.

Upon arriving at the Detox Center, Mr. Howard was promptly examined by a doctor after being propped up against a wall in a sitting position by the police. The doctor testified that he immediately recognized the signs of a spinal injury, because of Mr. Howard's unusual "decerebrate" posture and outwardly flexed palms, as well as his inability to use either his arms or his legs. In addition, although he remained coherent, asking the nurse to call his wife and providing the correct telephone number, Mr. Howard was having great difficulty breathing, and the doctor testified that the irregular pattern of breathing was of a type associated with severe spinal injury. The doctor instructed the emergency medical technicians to immobilize Mr. Howard's neck, which the doctor believed was broken, and to transport him to D.C. General Hospital.

Upon arriving at the hospital, Mr. Howard went into cardiac arrest. He became comatose, and died thirteen days later. His treating physician, Dr. Jessie Barber, testified that Mr. Howard had suffered a severe fracture of two of the vertebrae of his neck. Further, he testified that the injury had occurred at the time of the initial impact. The death certificate, prepared by Dr. Barber, listed the cause of death as "fractured neck with spinal cord contusion" caused by a "blunt force impact of [the] head."

At trial, Mr. Howard's widow presented the testimony of Dr. Jeffrey Goltz, who was qualified as an expert in orthopedics, orthopedic surgery and the standard of care for emergency medical technicians with respect to spinal immobilization and transportation of persons with spinal injuries. Dr. Goltz opined that properly trained emergency medical technicians would have recognized that Mr. Howard had a broken neck, and would have immobilized his head before moving him. He based his opinion on the type of training that emergency medical technicians were supposed to receive, as established by standards set by the American Academy of Orthopedic Surgeons and adopted by the U.S. Department of Transportation, and relied on two charts to indicate the physical symptoms that should have alerted the emergency medical technicians to suspect that Mr. Howard might have suffered a spinal injury. Dr. Goltz also testified in

response to other hypothetical questions that, based on the evidence regarding Mr. Howard's ability to move his limbs when he was at the bottom of the stairs, he was still "neurologically intact" at that point. Consequently, in Dr. Goltz' opinion, proper treatment of Mr. Howard by the emergency medical technicians, specifically the immobilization of his spine before allowing him to be moved, would have prevented Mr. Howard's subsequent paralysis and death.[3]

Mrs. Howard also called Robert J. DiGrazia as an expert witness on police practices and procedures and the standard of care for a reasonably competent police officer in transporting intoxicated persons. His testimony was offered to show that the police officers were negligent in the way that they transported Mr. Howard to the Detox Center. His testimony, however, did not differ in significant respects from expert testimony offered by the District that the officers acted properly in placing Mr. Howard face down in the paddy wagon.

The trial judge denied the District's motion for a directed verdict at the close of appellee's case, and at the close of all the evidence the jury returned a verdict in favor of appellee, finding that the District was liable for assault and battery of Mr. Howard by the police and for negligence by the emergency medical technicians and the police. The jury awarded appellee $676,-548.28 for the following damages: Mr. Howard's injuries, mental anguish, and discomfort between the time of the injury and his death; net future earnings; services to appellee; funeral expenses; and medical and hospital services. The trial judge thereafter denied the District's motion for judgment notwithstanding the verdict, or alternatively for a new trial or a remittitur.

## II

On appeal, the District's principal assignments of error relate to the expert testimony that was crucial to appellee's case and the limitation imposed on the testimony of the treating hospital physician. Specifically, the District contends that Dr. Goltz was not properly qualified as an expert to testify regarding the proper standard of care for emergency medical technicians, that he failed to establish the existence of a national standard of care, and that his opinion that the emergency medical technicians were negligent was not supported by the evidence and failed to demonstrate a causal link between the conduct of the emergency medical technicians and Mr. Howard's injuries. The District also contends that Mr. DiGrazia's testimony on the appropriate standard of care for transport of intoxicated persons by police officers was not based on nationally accepted standards and was

---

3. The District attacked Dr. Goltz's credibility on this point, particularly in view of his changing testimony regarding the nature of the injury to the spinal cord. For example, on cross-examination, the District explored with Dr. Goltz whether there was any difference between a "contusion" of the spinal cord and a "transection" of the spinal cord. In his deposition, Dr. Goltz had said that Mr. Howard's spinal cord had been "transected," and defined that term to mean severed. At trial, however, Dr. Goltz testified that he had used the word "transected" only to mean that Mr. Howard's spinal cord was damaged so severely that nerve impulses could not travel past the point of the injury. Both the treating physician, Dr. Barber, and the autopsy report identified Mr. Howard's injury as a "contusion," or bruise, of the spinal cord.

This testimony became important during closing argument. First, appellee's counsel used Dr. Barber's testimony to argue a last-minute assault and battery theory to the jury. This argument had not surfaced in the previous three weeks of trial, but was apparently a response to Dr. Barber's statement that Mr. Howard received all of his injuries at the moment of initial impact. To counter the inference that Mr. Howard's injuries were complete at the time of his fall, so that no action by District employees proximately caused his death, appellee's counsel developed an argument that shifted the moment of initial impact to the time when Mr. Howard was put in the paddy wagon. Thus, appellee's counsel argued that police officers "pitched" Mr. Howard into the paddy wagon with enough force to break his neck, and that the District was therefore liable for the full extent of his injuries.

Second, the contusion versus transection controversy surfaced in the District's closing argument. The District pointed out the discrepancy between Dr. Goltz's deposition testimony and his trial testimony, and asked the jury to weigh his conclusions accordingly. The District also emphasized Dr. Goltz's admission that the many other times that Mr. Howard was moved, in addition to his transportation by police officers, could also have caused the spinal cord damage.

self-contradictory regarding whether the officers breached the standard which Mr. DiGrazia described and if so, whether any link existed between the breach and Mr. Howard's injuries. In addition, the District contends that the trial judge erred in denying its motions for a directed verdict and for judgment notwithstanding the verdict on the assault and battery claim since there was no evidence upon which a reasonable juror could find that the transporting police officers had assaulted and battered Mr. Howard. Finally, in seeking a new trial, the District contends that the trial judge erred by restricting the testimony of Mr. Howard's treating physician at the hospital, Dr. Jessie Barber, and that the inability to present Dr. Barber's testimony regarding the mechanism of Mr. Howard's injury prejudiced the District's ability to rebut Dr. Goltz's testimony and the prejudice was aggravated by the distortion of Dr. Barber's testimony by appellee's counsel during closing arguments to the jury.

Because we agree that the trial judge erred in denying the District's motion for directed verdict, and thereafter for judgment notwithstanding the verdict, on the assault and battery claim, and erred in restricting Dr. Barber's testimony, and that the errors were not harmless, we hold that the District is entitled to a new trial. Accordingly, the judgment is reversed and the case is remanded for a new trial.

### A

■ We address first appellee's contention that the District failed to preserve certain issues for appeal. Our review of the record reveals that the District properly preserved for appeal its contentions that appellee failed to demonstrate a breach of the standard of care by the emergency medical technicians and the police, and that there was no evidence presented to the jury to support a finding of assault and battery

by the police. These issues were raised in the District's motion for a directed verdict and its motion for judgment notwithstanding the verdict. See Jarett v. Walker, 201 A.2d 523, 525 (D.C.1964). The record also is clear that the District preserved for appeal the issue of causation, contending at trial that the jury could only speculate, based on Dr. Goltz's testimony, about when the transection of Mr. Howard's spinal cord occurred, and that there was no definitive testimony that Mr. Howard's movement by the police caused the injury. Likewise the District preserved its contention that Mr. DiGrazia's testimony did not prove causation.

However, although the District did object during the trial to aspects of Dr. Goltz's testimony—namely, to his view about the duties of the emergency medical technicians to ask how the patient was injured, where he felt any pain, and whether he could move his extremities, as well as to inform the victim of his injury—the District did not preserve an objection sufficient to allow it generally to challenge Dr. Goltz's qualifications or his testimony about the national standard for emergency medical technicians. Moreover, any deficiencies with regard to Dr. Goltz's testimony about the national standard to which the District objected were cured by the District's own witness, EMT Gill, who described the training and responsibilities of emergency medical technicians when confronted with a conscious accident victim who apparently had been drinking. Gill's testimony about questioning and advising the injured person was essentially identical to Dr. Goltz's testimony.[4]

■ Finally, the District clearly preserved for appeal its claim that the trial judge erred in restricting Dr. Barber's testimony regarding the connection between Mr. Howard's initial injury and his paralysis and death. Not only was the objection

---

4. EMT Gill testified that he had been trained to check all conscious accident victims for signs of spinal injury by asking the patient what happened, where he felt any pain, and whether he or she had sensation in the extremities. Complaints from the patient about painful movement would be a sign of a possible neck or back injury. He further stated that from his training he knew that he had to take more time in assessing the injuries of a possibly intoxicated patient because the intoxication could mask a serious injury. If any spinal injury was suspected, Gill testified that he was instructed to immobilize the spine.

clearly raised when the District made its proffer of Dr. Barber's testimony at trial, it was raised during his voir dire and again in the District's written motion for judgment.

## B

Turning to the merits, we hold that appellee met her burden to establish Dr. Goltz's qualifications, including his experience in diagnosis, and a national standard of care for emergency medical technicians. As noted, Ronald Gill, one of the emergency medical technicians at the scene, provided the jury with evidence about the training received by emergency medical technicians and what they were expected to do upon finding a person who had apparently been drinking in Mr. Howard's circumstances. Dr. Goltz, in turn, referred to a Department of Transportation manual and national standards adopted by the American Academy of Orthopedic Surgeons, which he characterized as an "authoritative" guideline for the detection and treatment of spinal injury by emergency medical technicians. In addition, appellee presented sufficient evidence from which the jury could reasonably find that the emergency medical technicians had breached the standard of care. *Cf. Parello v. Lomax*, 253 A.2d 463 (D.C.1969) (in determining whether the finding of negligence was contrary to the weight of the evidence, court views evidence and inferences in light most favorable to appellee) (citing *Safeway Stores v. Leake*, 147 A.2d 439 (D.C.1959)). EMT Gill's testimony, along with the deposition of his colleague, Violet Maddox, that was offered into evidence, and the testimony of the Crawfords, was sufficient for a reasonable jury to find that the emergency medical technicians did not examine Mr. Howard as they should have. The jury could reasonably credit the testimony of the Crawfords that Mr. Howard was not combative, as well as the testimony of EMT Gill that Mr. Howard did not resist examination. Alternatively, the jury could reasonably find that, because Mr. Howard had been drinking and had been lying at the bottom of the steps for at least two hours,

his capacity to discover the seriousness of his injury was diminished and the emergency medical technicians, consistent with the standard for examining injuries of intoxicated persons, should have examined Mr. Howard more closely.

Because the jury was presented with an appropriate basis for a finding of negligence on the part of the District due to the conduct of the emergency medical technicians, we need not reach the District's contentions with respect to Mr. DiGrazia's testimony about the conduct of the police officers who transported Mr. Howard to the Detox Center. Nevertheless, because we hold that the District is entitled to a new trial, we note that Mr. DiGrazia's testimony, even if adequate to establish a national standard of care (an issue we do not decide), clearly did not provide a basis on which the jury could reasonably find that the police breached the standard in placing Mr. Howard face down in the paddy wagon. Mr. DiGrazia's testimony on this point was in accord with that of the District's police transport expert that, in general, it was proper police procedure to transport an intoxicated but otherwise uninjured person face down, to assure that the person did not choke if he began to regurgitate while being transported. As to other aspects of the standard Mr. DiGrazia described, such as his suggestion that an officer could ride in the back of the wagon to insure the safety of the individual being transported, Mr. DiGrazia conceded that this was not a general practice. Consequently, we agree with the District that, assuming a police transport standard was properly established, there was insufficient evidence to prove its breach by the police officers who transported Mr. Howard to the Detox Center. Moreover, Mr. DiGrazia's testimony did not contradict that of the District's expert, Mr. Glenn Murphy, who testified that it was appropriate for the police officers to defer to the judgment of knowledgeable individuals on the scene in determining whether to transport an individual.[5]

5. Mr. Murphy testified that although the trans-

port officers could have spoken to the emergen-

### C

■ We also hold that appellee met her burden to show causation. From the evidence showing a breach of the standard by the emergency medical technicians, and Dr. Goltz's testimony about the effect of a breach of the standard of care, the jury could reasonably find that had the emergency medical technicians properly examined Mr. Howard, they would have suspected that he had injured his spine and immobilized him before he was moved by the police, thereby preventing his paralysis and death. Because Mr. Howard allowed the emergency medical technicians to touch him while applying a blood pressure cuff, the jury could find that, although Mr. Howard expressed his desire not to be hospitalized, he would nonetheless have allowed the emergency medical technicians to touch his neck in a manner sufficient to diagnose his injury. The District's contention that Dr. Goltz's testimony did not provide definitive evidence of when the critical movement of Mr. Howard occurred is unpersuasive. Dr. Goltz testified that Mr. Howard was neurologically intact at the bottom of the stairs, and the persons at the scene testified that Mr. Howard was able to move his arms before the police took him to the paddy wagon. The District was free to challenge the expert testimony, but the jury was not therefore required to reject it.[6] *See Jackson v. Condor Management Group, Inc., supra,* 587 A.2d at 226 (where case turns on controverted facts and credibility of witnesses, issue is for jury, even when expert opinion involved; jury may accept expert's testimony grounded on evidentiary facts or reasonable inferences even if scientific basis for expert's conclusion is disputed by another expert); *Spain*

*v. McNeal,* 337 A.2d 507, 511 & n. 6 (D.C. 1975) (weight to be given an expert's opinion is a matter for the jury to determine).

### D

■ The District, however, is correct in contending that there was insufficient evidence of an assault and battery of Mr. Howard by the police and, hence, the claim should not have been allowed to go to the jury. The trial judge, while acknowledging that the area was "quite troubling," nevertheless denied the District's motion for a directed verdict on the basis of testimony from Ms. Howard and a detective, who saw Mr. Howard in the hospital the day after his fall and observed cuts on his face, as well as medical reports which stated that Mr. Howard had abrasions on his forehead that were not present until after his ride in the paddy wagon. None of the witnesses relied on by the trial judge offered any testimony that would support a finding of an intentional assault and battery by the police. *See Person v. Children's Hosp. Nat'l Medical Center,* 562 A.2d 648, 650 (D.C.1989) ("An assault results from apprehension of an imminent harmful or offensive contact, in contrast with the contact itself"); *Madden v. District of Columbia Transit Sys.,* 307 A.2d 756, 757 (D.C.1973) (battery requires proof of intent to cause an offensive touching); *see also Rogers v. Loews L'Enfant Plaza Hotel,* 526 F.Supp. 523, 529 (D.D.C.1981) (elements of assault and battery); *Anthony v. United States,* 361 A.2d 202, 204 (D.C.1976) (assault is attempt with force or violence to do injury to another, coupled with apparent present ability to do so).[7] The medical reports, in turn, were consistent with the manner in which Mr. Howard rode to the Detox Cen-

---

cy medical technicians, they were not required to do so, because a supervisory officer, Officer Miller (identified by Mr. Murphy as the "incident scene officer" who arrived first and was responsible for making key decisions), had previously visited the scene and participated in the decision to call for the paddy wagon to transport Mr. Howard to the Detox Center.

**6.** *But see* Part III, in which we conclude that the District was prejudicially hindered in its ability to challenge Dr. Goltz's testimony.

**7.** It is generally accepted that police may use a certain degree of force to carry out their duties, so long as the amount of force is not excessive and their actions are otherwise reasonable. *See Gabrou v. May Dep't Stores Co.,* 462 A.2d 1102, 1104–05 (D.C.1983) (in civil suit for false arrest and assault and battery police officers could defend themselves by demonstrating that their actions were reasonable and that any force used was not excessive); *Wade v. District of Columbia,* 310 A.2d 857, 862 (D.C.1973) (same).

ter, face down in the paddy wagon, and they do not provide evidence to support the assault and battery claim.[8]

The record is bereft of any evidence that the police, as appellee's counsel argued to the jury, "pitched" Mr. Howard into or out of the paddy wagon, much less that they did so with the force required to break his neck. The medical evidence was fully consistent with the testimony about why and how the police carried Mr. Howard to the paddy wagon and placed him face down on the floor of the paddy wagon and afterwards removed him upon arriving at the Detox Center. Testimony by appellee's expert, Dr. Goltz, was consistent with the Crawfords' testimony, that Mr. Howard broke his neck when he fell down the stairs but could still move his arms and legs and that therefore it was the subsequent movement of him by the police—in carrying him to the paddy wagon—that caused the injury to his spinal cord. His testimony regarding the police was that any movement would have damaged the spinal cord, not that the movement had to be a forceful one. Nor did the evidence presented by the District provide a basis on which the jury could find assault and battery by the police. Dr. Barber's testimony, on which appellee relied in closing argument, *see infra* Part III, referred to the injury occurring at the time of initial impact, but no reasonable juror could find that the initial impact occurred when the police put Mr. Howard into the paddy wagon. There was no testimony which suggested that Mr. Howard was put into or out of the paddy wagon with the type of offensive touching and force necessary to sustain appellee's claim. Hence, the trial judge erred in denying the District's motions for a directed verdict and for judgment notwithstanding the verdict on the assault and battery claim.[9] *Jackson v. Condor Management Corp, Inc.*, 587 A.2d at 224 (directed verdict proper when

no evidentiary foundation exists upon which a reasonable juror could base a reliable verdict) (citing *Papanicolas v. Group Hospitalization, Inc.*, 434 A.2d 403, 404 (D.C.1981)); *see also Oxendine v. Merrill Dow Pharmaceuticals, Inc.*, 506 A.2d 1100, 1103 (D.C.1986); *Payne v. Soft Sheen Prod., Inc.*, 486 A.2d 712, 719 (D.C.1985); *Marshall v. District of Columbia*, 391 A.2d 1374, 1379 (D.C.1978).

### III

The District also contends, in seeking a new trial, that when the improper evidence is set aside the evidence shows only that Mr. Howard had too much to drink, broke his neck when he fell down the stairs and thereby caused damage to his spinal cord that resulted in his paralysis and death. It maintains that appellee's experts' opinions about the injury was based on factual assumptions that were not supported by the evidence and the verdict rested on speculation. Furthermore, the District contends that under *Adkins v. Morton*, 494 A.2d 652 (D.C.1985), Dr. Barber should have been allowed to testify regarding the opinions that he had formed as an "actor" or "viewer" in the course of treating Mr. Howard and that he could do so even though the District had not listed him as an expert witness in its Rule 26(b)(4) statement. Citing *Weeda v. District of Columbia*, 521 A.2d 1156 (D.C.1987), the District argues that the resulting prejudice is clear, since Dr. Barber was not permitted to testify about the medical connection between the initial injury and Mr. Howard's paralysis and death, and the partial testimony that he was allowed to present was distorted by appellee's counsel during closing arguments to the jury.

The trial judge ruled that Dr. Barber would not be allowed to testify as an expert witness because the District had failed to list him as an expert witness under

---

**8.** Mr. DiGrazia testified that, in typical cases involving individuals who are intoxicated but not otherwise injured, transporting the individual face down is appropriate.

**9.** In view of our conclusion that the erroneous limitations placed upon Dr. Barber's testimony require a new trial, we do not consider whether

appellant would be entitled to some relief on the basis that the amount of the jury's verdict may have been affected by the fact that the jury found appellant liable on two theories of liability that we hold should not have been submitted to the jury.

Super.Ct.Civ.R. 26(b)(4).[10] Both parties, however, had listed Dr. Barber as a witness in their pretrial statements. Specifically, the trial judge ruled that while Dr. Barber would be allowed to testify about the opinions he had formed in the course of treating Mr. Howard, and the District would be entitled to qualify him as an expert in that regard, it would not be permitted to ask him hypothetical questions.

Nevertheless, during Dr. Barber's testimony, the trial judge, in response to repeated objections by appellee's counsel, prohibited questions to Dr. Barber relating to whether the injuries that he found in the course of his examination of Mr. Howard were consistent with the statement in the medical record that Mr. Howard had fallen down the stairs. The basis of the trial judge's ruling arose from her understanding that the District earlier had objected when appellee's counsel, during Dr. Barber's deposition, attempted to pose hypothetical questions. The District thus appeared to disavow eliciting this type of testimony from Dr. Barber. The judge referred to *Adkins v. Morton* and the expert witness rule in commenting that they were designed to avoid surprise at trial and the resulting prejudice.[11] 494 A.2d at 660.

■ *Adkins v. Morton* makes clear that a treating physician testifies as "an actor and viewer of transactions or occurrences that are part of the subject matter of the lawsuit," and may testify about his or her opinions developed in the course of treating the patient. *Id.* at 657 (quoting the advisory committee note on FED.R. CIV.P. 26(b)(4)) (citations omitted). Such a physician need not be treated as a Rule 26(b)(4) expert. By contrast, a physician whose facts and opinions are "acquired or developed in anticipation of litigation for trial" must be listed in a party's Rule 26(b)(4) statement. *Id.* at 656 (quoting the rule). In distinguishing treating physicians from Rule 26(b)(4) experts, the crucial inquiry is "whether the facts and opinions possessed by the expert were obtained for the specific purpose of preparing for the litigation in question." *Adkins v. Morton* also makes clear, however, that even experts who are actors and viewers "may be barred from testifying at trial about certain matters if, during the discovery process, there has been a disavowal that such testimony would be elicited." *Id.* at 660.

■ The trial judge's initial ruling, that Dr. Barber would not be permitted to respond to hypothetical questions, was consistent with *Adkins v. Morton* because the District appeared to disavow this line of questioning. *Id.* at 660. When confronted with appellee's objections to any questions to Dr. Barber about his opinion regarding the mechanism of injury, however, the judge ruled that Dr. Barber would not be allowed to testify about the opinions that

---

**10.** Super.Ct.Civ.R. 26(b)(4), regarding pretrial discovery, provides, in pertinent part:

Trial preparations: Experts. Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (b)(1) of this Rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows: (A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. (ii) Upon motion, the Court may order further discovery by other means, subject to such restrictions as to scope and such provisions, pursuant to subdivision (b)(4)(C) of this Rule, concerning fees and expenses as the Court may deem appropriate.

**11.** The trial judge was presented with repeated representations by counsel for the District that appellee's counsel had been informed six months earlier that the District intended to call Dr. Barber as an expert witness; in addition, counsel referred to providing the information during a status conference with Judge Gardner. This placed the trial judge, as she noted, in a difficult position. In resolving the matter the judge decided that the burden was on the District to clarify the nature of Dr. Barber's proposed testimony since it had indicated during his deposition that he would not be called as an expert witness. While appellee's counsel acknowledged that they were aware at the beginning of the trial of the District's intention, they did not recall being so advised during a status conference with Judge Gardner. The trial judge accepted appellee's representations to the court.

he formed as a result of treating Mr. Howard on the mechanism of injury and on the types of incidents that could have caused the fracture suffered by Mr. Howard. This was error. The District did not disavow this line of questioning, which clearly concerns opinions of a treating physician not within the scope of Rule 26(b)(4).

The jury was entitled to hear Dr. Barber's opinion about the mechanism of injury, as he indicated that he always tried to determine mechanism of injury in the course of treating his patients. *Id.* at 658. Moreover, the District was not barred from presenting Dr. Barber's opinion about the connection between the initial injury and Mr. Howard's paralysis and death as a result of representations made by the District during Dr. Barber's deposition. The District did not disavow this line of questioning; it did not object during the deposition to questions about Dr. Barber's treatment of Mr. Howard, or to questions by appellee's counsel that sought an opinion from Dr. Barber based on his examination of Mr. Howard. Appellee did not ask any questions about Dr. Barber's opinion regarding the connection between the initial injury and the paralysis and death.[12] Nor did the District state that it would not ask Dr. Barber about his opinion regarding the mechanism of injury or causation. The District therefore should have been allowed to ask Dr. Barber about his opinion of the mechanism of the injury without first listing his name in its Rule 26(b)(4) statement.

The failure to allow Dr. Barber to testify about the connection between Mr. Howard's initial injury and death resulted in the jury having a misleading view of Dr. Barber's testimony and, consequently, a misleading view about causation. The District was thereby hampered in its ability to rebut the evidence introduced by appellee that, according to Dr. Goltz, Mr. Howard was neurologically intact after his fall down the stairs and that the movement by the police caused the injury to his spinal cord. *See id.* at 658–59 (party hampered in ability to rebut opposing party's testimony). Dr. Barber's testimony that the injury to the spinal cord occurred as a result of the initial impact, standing alone, was insufficient to counter effectively the testimony of appellee's medical expert. *See id.* at 659. The prejudice was exacerbated, as discussed *infra*, by the manner in which appellee's counsel used Dr. Barber's testimony during closing arguments to the jury. In view of appellee's own listing of Dr. Barber's name in her pretrial statement, her counsel's unobjected-to question about Dr. Barber's opinion as to Mr. Howard's prognosis, and the withdrawal of the objected-to questions, as well as counsel's statements during Dr. Barber's deposition and at trial that he had no doubts about the doctor's reputation as a skilled neurosurgeon, we cannot conclude that appellee would have been unfairly surprised had Dr. Barber been allowed to testify regarding the mechanism of injury. Furthermore, because causation was hotly contested at trial, the manner in which appellee used Dr. Barber's testimony during closing arguments necessitates a new trial. *Bell v. Westinghouse Elec. Corp.*, 483 A.2d 324, 327 (D.C.1984) (new trial may be granted when necessary to "prevent injustice" as a result of prejudicial error in trial proceedings).

In closing argument Dr. Barber's testimony became the centerpiece of appellee's counsel's argument that the police had caused the fatal injury to Mr. Howard. Dr. Barber testified that

the primary damage and pressure on the spinal cord took place at the time of the original injury immediately, and the kind of pressure that continues at the time that I saw the x-rays is not nearly as great as what the force of the blow at the time had to have been to cause the dislocation.

Appellee's counsel interpreted Dr. Barber's testimony not simply as describing his

---

**12.** During Dr. Barber's deposition, the District had objected to "the hypothetical expert type question" when appellee's counsel attempted to ask Dr. Barber his opinion on (1) whether Mr. Howard's congenital malfunction of the neck made him any more susceptible to a broken neck than a normal person, and (2) assuming he had been able to move his hands and legs at 11 or 11:30 p.m., whether Mr. Howard had a fractured neck.

treatment and observations of Mr. Howard. Instead, counsel argued that "under Dr. Barber's theory," the injury to Mr. Howard's spinal cord occurred when the police had "pitched" Mr. Howard into the paddy wagon. Based on Dr. Barber's testimony, recounted by appellee's counsel to the jury to the effect that the "paralysis resulted when the blow took place," counsel argued to the jury:

> Now if the man can move at the bottom of the stairs obviously that's not when the blow took place that did the damage to the spinal column—spinal cord. * * * [u]nder Dr. Barber's theory it doesn't take a rocket scientist to figure out what happened here. They pitched this man in the paddy wagon, and they fractured his neck and they killed him.

In fact, during voir dire outside of the presence of the jury, Dr. Barber had made clear that his explanation for the injury to the spinal cord was far different. In his experience:

> every time I have seen a fracture of the spinal cord of this nature, it has been associated with a history of severe impact such as a fall, such as a high velocity [sic] vehicular accident or something of that sort. So that my assumption is that it would require a great deal of force.

This is very different from the interpretation given by appellee's counsel during his closing argument to the jury.

Appellee's counsel's misuse of Dr. Barber's testimony was not limited to a single incident. The mischaracterization of his testimony occurred again during the initial closing argument and also at the end of rebuttal closing argument. Thus, appellee's counsel recounted Dr. Barber's testimony that damage to the spinal cord and the impact of great force occurred at the same time, causing the bones to be jammed together. In so doing, counsel referred to the cord being "transected with an application of great force," and, in the same sentence, referred to the "spinal cord contusion due to blunt force impact of head" in the death certificate, which was signed by Dr. Barber. Counsel thus sought to blur the distinction between the testimonies of Dr. Goltz and Dr. Barber about the nature of the damage to the spinal cord, a point to which counsel returned at the close of his rebuttal argument. *See* note [3], *supra.* Counsel also argued to the jury, at the close of the initial argument to the jury, "what happened here according to Dr. Barber and according to the autopsy is that the police either had to pitch him into the wagon, or they had to pitch him out, streak-like diagonal prominent scarring four inches long on the side of the man's face."

Despite argument by counsel for the District that the two doctors' testimonies were not reconcilable as appellee's counsel argued, the contrary argument was forcefully presented. This was made especially clear when, at the close of the rebuttal closing argument, appellee responded to the District's argument. During its closing argument to the jury, the District had called attention to the differences between Dr Goltz' and Dr. Barber's testimonies regarding whether Mr. Howard suffered a transection or a contusion of the spinal cord. In rebuttal argument, appellee's counsel told the jury that Dr. Barber agreed with Dr. Goltz on the transection of the spinal cord. The District's objection, on the ground that "this was a most outrageous mischaracterization of the testimony," since Dr. Barber had testified that there was no transection of the cord, was overruled.

The prejudice that resulted from the restriction of Dr. Barber's testimony is even clearer from the jury's award of damages. During closing argument, appellee's counsel told the jury that it should award appellee the full cost of the medical expenses at D.C. General Hospital only if the jury believed that Mr. Howard's "neck was fractured when he was pitched into the paddy wagon" since appellee made no claim for treatment as a result of his fall down the stairs. The jury awarded the full cost. In other words, the jury accepted appellee's counsel's mischaracterization of Dr. Barber's testimony as supporting the view that Mr. Howard's paralysis was caused by the police when they "pitched" him into the paddy wagon. Appellee could point to no

testimony by a witness on the scene, including the Crawfords, to support the suggestion that the police "pitched" Mr. Howard in the wagon with such force as would have caused the type of injury Mr. Howard suffered, requiring, as Dr. Barber testified, 60 pounds of weight, over a period of hours, to straighten out Mr. Howard's spine.

Having heard Dr. Barber's testimony during voir dire, appellee's attorneys were aware that his view of the origin of the fatal injury was not consistent with Dr. Goltz's view or the assault and battery claim. At no point was it suggested to Dr. Barber that Mr. Howard's initial injury was other than his fall down the stairs. Nor did appellee's counsel ask him about the effect of Mr. Howard's being put or "pitched" into the paddy wagon. Hence, there was no basis on which counsel could properly argue to the jury that Dr. Barber's testimony supported appellee's claim of police action as constituting the initial, and fatal, blow. What counsel tried to do was to reconcile Dr. Goltz's testimony about Mr. Howard's neurological integrity at the bottom of the stairs and the complication presented by Dr. Barber's testimony that the fatal injury occurred upon initial impact. Unlike counsel and the trial judge, the jury remained unaware of Dr. Barber's opinion about the connection between the initial injury and the paralysis and death.

Dr. Goltz testified on cross examination that any movement by Mr. Howard, especially of his head, could have severed the spinal cord, causing paralysis or death. There was evidence from the Crawfords and the emergency medical technicians that Mr. Howard had moved his arms when he was at the bottom of the stairs and that the Crawfords had moved him. All of this testimony was consistent with Dr. Goltz's opinion that Mr. Howard was neurologically intact before the police moved him so long as appellee's theory was that the failure to immobilize Mr. Howard and the manner in which the police carried him had damaged his spine. When Dr. Barber testified that the initial impact caused the damage to Mr. Howard's spine, appellees were confronted with a problem. If Mr. Ho-

ward's injuries resulted from the initial impact, the negligence, if any, of the District's employees thereafter did not exacerbate his condition or cause his death. Counsel for appellee attempted to reconcile the conflicting testimony by emphasizing a new aspect of the assault and battery theory. The theory used Dr. Barber's testimony that the full extent of Mr. Howard's fatal injuries occurred at the time of the initial impact, and made it consistent with liability on the part of the District by transferring the point of initial impact to the moment at which Mr. Howard was placed in the paddy wagon, and attributing his injuries to the blameworthy conduct of the police.

Had Dr. Barber been allowed to testify about his view of the connection between the initial injury and Mr. Howard's paralysis and death, the jury would have been informed that the doctor who had examined Mr. Howard had concluded that the fatal injury had occurred when his spine was struck by a tremendous amount of force, such as would occur in a fall or a vehicular accident. The only evidence of such an amount of force was his fall down a flight of stairs onto a concrete patio. Without this additional evidence the jury was left with the view that Dr. Barber thought Mr. Howard's spine had been fatally injured when he was moved by the police and "pitched" into the paddy wagon.

Thus, the jury was deprived of evidence that was directly relevant to its determination of whether the emergency medical technicians' violation of the standard of care proximately caused Mr. Howard's paralysis and death. *See Weeda, supra,* 521 A.2d at 1161–63 (evidence of plaintiff's intoxication relevant to jury's determination of whether medic's negligence in extracting plaintiff from a wrecked car proximately caused plaintiff's injuries). Moreover, counsel did exactly what he objected to when the District sought to ask Dr. Barber about his opinion of the mechanism of the injury—he used treatment evidence to support an expert theory that was not in evidence. By so representing Dr. Barber's "theory" to the jury, appellee's counsel at-

tempted to bolster the weaknesses in Dr. Goltz' testimony and mischaracterized Dr. Barber's testimony to support her claim of injury by assault of the police, a claim which never should have been allowed to go to the jury.[13]  *See supra* Part II D. The result infected the trial with prejudicial error, and the District is therefore entitled to a new trial.

Accordingly, the judgment is reversed and the case is remanded for a new trial.

*So ordered.*

---

**13.** The verdict form given to the jury listed the police assault claim first, followed by the police negligence claim. Last listed was the emergency medical technician negligence claim.